**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------X

UNITED STATES OF AMERICA

    - against -

FREDDY GONZALEZ,

             **Defendant.**

-------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11 30 11

**OPINION AND ORDER**

**S1 08 CR 684 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I. INTRODUCTION

Gonzalez was indicted on July 24, 2008, in a single-count sealed

Indictment charging him with the intentional murder of Carlos Polanco (the

"Queens Homicide"). That same day, July 24, 2008, Magistrate Judge Frank Maas

issued an arrest warrant. At the time he was indicted, Gonzalez was incarcerated at

the McRae Correctional Facility in Georgia, where he was serving a term of

imprisonment for illegal re-entry, set to expire on August 27, 2008. The day after

the Indictment and warrant were issued, July 25, 2008, four law enforcement

agents – Billy Ralat, former Detective Stefano Braccini of the New York City

Police Department, and Detectives Wilson Gonzalez and John Geiss of the City of

Yonkers Police Department – visited Gonzalez at the McRae facility. The agents

were hoping to obtain a statement from Gonzalez about his involvement in the

Queens Homicide and three other unsolved murders. Although these four agents

knew that Gonzalez had been indicted, they did not intend to arrest him that day. In fact, they did not know whether an arrest warrant had been issued for Gonzalez's arrest.[1]

Ralat, a criminal investigator with the U.S. Attorney's Office for the Southern District of New York, took the lead during the questioning of Gonzalez. As a result of Ralat's questioning, Gonzalez provided written statements implicating himself in four homicides (the "Confessions"). The next business day, July 28, 2008, the U.S. Attorney's Office obtained and lodged a writ *ad prosequendum*, thereby facilitating Gonzalez's transport to this District. Gonzalez was brought before a Magistrate Judge for presentment on August 15, 2008. An S1 Superseding Indictment was filed on April 14, 2009, charging Gonzalez with three additional murders.

Gonzalez has moved to suppress the July 25 statements allegedly elicited in violation of his Fifth and Sixth Amendment rights. In particular, Gonzalez argues that his Confessions were elicited involuntarily in violation of his right to due process. Gonzalez further argues that he unambiguously invoked his

---

[1]      *See* Fed. R. Crim. P. 4(c)(1) ("Only a marshal or other authorized officer may execute a warrant."); Rule 4(c)(3)(A) ("A warrant is executed by arresting the defendant. Upon arrest, an officer possessing the warrant must show it to the defendant."). Hereafter, references to a "Rule" are references to the Federal Rules of Criminal Procedure, unless otherwise noted.

right to remain silent and his right to the assistance of counsel. Accordingly, he argues that his Confessions were obtained in violation of his rights under the Fifth Amendment to the United States Constitution, *Miranda v. Arizona*[2] and *Edwards v. Arizona*.[3] Finally, Gonzalez argues that his Sixth Amendment right to counsel was violated because he was already under indictment for the Queens Homicide at the time of the jailhouse interrogation. For the following reasons, Gonzalez's motion to suppress is denied in its entirety.

## II. DISCUSSION

### A. Gonzalez Knowingly and Voluntarily Waived His *Miranda* Rights While Failing to Invoke His Right to Counsel

Gonzalez signed two *Miranda* waiver forms: one in Spanish, co-signed by Ralat and Detective Gonzalez at 11:24 a.m.; and the second in English, signed by the same signatories at 12:30 p.m.[4] Other than being in different languages, the only difference between the two waivers is that Gonzalez wrote "NO" in response to Question # 6 in the first waiver and "Si" in the second waiver in response to the same question, which states: Now that I have advised you of

---

[2]   384 U.S. 436 (1966).

[3]   451 U.S. 477 (1981).

[4]   *See* Exs. D & E to Memorandum in Support of Defendant's Motion for Pre-Trial Relief ("Def. Mem.").

your rights, are you willing to answer questions? Because of the "NO" in the first waiver, defense counsel argued that:

> [t]he [C]onfessions obtained from Mr. Gonzalez were elicited involuntarily and through the use of coercive pressures, violating his right to due process of law. Furthermore, once Mr. Gonzalez had unambiguously invoked his right to remain silent and his right to the assistance of counsel, any further questioning by the agents was prohibited under the Fifth Amendment, *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Edwards v. Arizona*, 451 U.S. 477 (1981). Finally, because Mr. Gonzalez was already under indictment for the crime charged under count one of the instant Indictment at the time of his jailhouse interrogation, his statements regarding that crime were also obtained in violation of his Sixth Amendment right to counsel.[5]

In support of these arguments, Gonzalez submitted an Affidavit in both English and Spanish.[6] To test the veracity of defendant's underlying factual assertions, I held a hearing which began on September 26, 2011, continued on September 28, 2011, and concluded on October 4, 2011.[7]

---

[5] Def. Mem. at 5.

[6] *See* Ex. C to Def. Mem.

[7] "Tr." followed by a number is used to refer to pages of the hearing transcript.

4

The Government argued, pre-hearing, that the violations alleged by defendant were based on an incorrect factual predicate.[8] According to the Government, the agents did not violate Gonzalez's rights to remain silent and to counsel because

> [a]fter Gonzalez signed the first *Miranda* form, the agents prepared to leave. It was Gonzalez who then told the agents, in substance and in part, that they had misunderstood him and that he in fact wanted to speak with them. . . . Even after Gonzalez insisted on speaking with the agents, the agents went through Gonzalez's options, ensured that Gonzalez understood his rights to remain silent and to counsel and wanted to waive them, and even had Gonzalez sign a new *Miranda* form memorializing that knowing waiver.[9]

Upon review of the testimony of the four Government witnesses at the hearing, and the inconsistencies therein noted by defense counsel, I find that the Government has presented the more credible version of what actually transpired during the prison interview in McRae, Georgia.

Ralat testified that he and the other agents arrived at the McRae correctional facility at 11:00 a.m.[10] Ralat and Detective Gonzalez were the only

---

[8] *See* Government's Memorandum of Law in Response to Defendant's Motion to Suppress ("Gov't Mem.") at 11.

[9] *Id.* at 11-12 (citation omitted).

[10] *See* Tr. at 21.

Spanish-speaking agents.[11]  The four agents met Gonzalez in an unlocked visiting room and began the questioning at approximately 11:15 a.m.[12]  Gonzalez signed the first *Miranda* waiver form at 11:24 a.m.[13]  Gonzalez wrote "NO" in response to Question # 6 on the first *Miranda* waiver, which stated in Spanish: "Now that I have advised you of your rights, are you willing to answer questions?"[14]  Upon seeing the word "NO," Ralat testified as follows:

> I turned to the other investigators in the room and I told them the meeting is over.  He signed no for number 6.  We then proceeded to stand up.  Detective Braccini was actually to my right.  I remember him specifically talking about, can we bump our flight up to get out of town as early as possible.  And I turned to him and I told the defendant that the meeting was over with.  And he told me why?  I want to talk to you.  Don't leave.[15]

Not sure what to do at this point, Ralat turned to the other agents and they collectively decided to sit down again with Gonzalez and fully explain to him the benefits of cooperation.[16]  If, at the end of this explanation, Gonzalez decided he

---

[11]     *See id.* at 25.

[12]     *See id.* at 25, 73.

[13]     *See id.* at 34.

[14]     *See id.* at 35.

[15]     *Id.* at 36.

[16]     *See id.* at 37-38.

wanted to speak to the agents, Ralat would re-Mirandize him before continuing.[17]

Ralat testified as to why he made this decision.

> Because I felt it was important that he [Gonzalez] fully understand what was going on. It seemed like he was confused. He originally tells me he wants to speak to me, I give him the Miranda form, he then signs no. And then when we get up to leave he then says not to leave, that he wants to speak to us. There was confusion and I didn't want to continue under that state. I felt that it was best that I explained again the system, where we were going, that he was coming to New York, that was a different system than he had experienced in the past, and if he elected to speak to us that he was doing it of his own free will, and that's exactly what happened.[18]

Ralat's comprehensive explanation took approximately forty to fifty minutes to complete.[19] At the end of his explanation, Ralat handed Gonzalez another *Miranda* waiver form. Ralat inadvertently provided Gonzalez with a *Miranda* waiver form in English the second time around.[20] At 12:30 p.m, Gonzalez answered "si" to every question on this second *Miranda* waiver form.[21] According to Ralat, neither

---

[17]    *See id.* at 38.

[18]    *Id.*

[19]    *See id.* at 38-39.

[20]    *See id.* at 40, 84 ("And he signed off on it, and at no point did the defendant, myself, or Wilson ever say, hey, that form is in English. I just never realized that it was.").

[21]    *See id.* at 41-42.

he nor the other agents questioned Gonzalez about any of the murders before he signed the second *Miranda* form.[22] The following questions were asked during Ralat's cross-examination:

> Q.   You specifically told Detective Geiss, he, meaning, Mr. Gonzalez, is not willing to talk to us, we got to go, or words to that effect, correct?
>
> A.   Correct.
>
> Q.   And at 11:24, between 11:24 and let's say 12:30 or so, you did not speak to Mr. Gonzalez specifically about the Queens homicide, did you?
>
> A.   No.
>
> Q.   And between 11:24 and 12:30 or so, Mr. Gonzalez did not speak to you about the Queens homicide, did he?
>
> A.   That's correct.
>
> Q.   And after you observed Mr. Gonzalez wrote no at 11:24, you didn't talk to him about any murder cases at all, Queens, Yonkers, anything at all, did you?
>
> A.   That's correct.
>
> Q.   And between 11:24 and 12:30 or so, you didn't speak about any substance of any of the murders, did you?

---

[22]   *See id.* at 42-43.

A.     That's correct.[23]

After Gonzalez signed "Si" to every question in the second *Miranda*

waiver form, Ralat began to question him, in Spanish, about the Queens

Homicide.[24]   Gonzalez began writing his first written statement, which concerned

the Queens Homicide, at 12:50 p.m.[25]   At 1:15 p.m., Gonzalez signed his first

written statement, which was then co-signed by Ralat and Detective Gonzalez.[26]

Shortly after Gonzalez made his first written statement, Detective Geiss began

questioning him about the Yonkers murders.[27]   Detective Geiss then showed

Gonzalez some photographs and it was at this point in the questioning that

Gonzalez began answering Detective Geiss in English.[28]   The Government has

conclusively established that Gonzalez is fluent in English as evidenced by, *inter*

*alia*, his filing of a legal document in English in another matter.[29]

---

[23]     *Id.* at 77-78.

[24]     *See id.* at 43.

[25]     *See id.* at 44.

[26]     *See* Ex. F to Def. Mem. (including all three written statements).

[27]     *See* Tr. at 46.

[28]     *See id.*

[29]     *See* Affidavit in Support of Motion to Vacate Judgment, Ex. 1 to Gov't Mem.

Gonzalez made two written statements about the Yonkers homicides: he began writing the second statement about the double homicide at 2:25 p.m. and completed it at 2:40 p.m.; he began the third statement about the single Yonkers murder at 2:55 p.m. and signed it at 3:10 p.m.[30]   Ralat and Detective Gonzalez also co-signed these statements.[31]

Ralat testified that at no point during the questioning did Gonzalez ever ask for a lawyer, either in Spanish or English.[32]   Detective Gonzalez corroborated this when he was asked the following questions:

> Q.   At any time from the moment that you met Mr. Gonzalez until the moment that you left, did you ever hear Mr. Gonzalez ask for an attorney in either Spanish or English?
>
> A.   No, he never did.
>
> Q.   During the entire time that you were there, from the moment you met Mr. Gonzalez until the moment you left, did any agent tell Gonzalez that he did not need an attorney to talk to the agents and that if wanted an attorney he would get one in court?
>
> A.   No.[33]

---

[30]   *See* Ex. F to Def. Mem.

[31]   *See id.*

[32]   *See* Tr. at 53.

[33]   *Id.* at 110.

Detective Geiss also confirmed that Gonzalez never asked for an attorney at any point during the questioning.[34] This was also corroborated by Detective Braccini.[35]

Ralat's version of the events surrounding Gonzalez's first *Miranda* waiver and the agents' response thereto was corroborated by Detective Gonzalez.[36] Detective Geiss provided further corroboration.[37] Detective Braccini also corroborated Ralat's testimony.[38] Detectives Gonzalez and Geiss also corroborated Ralat's testimony that neither he nor the other agents questioned Gonzalez at any point prior to his signing the second *Miranda* waiver form.[39]

---

[34]   *See id.* at 164, 165, 170.

[35]   *See id.* at 226-227.

[36]   *See id.* at 102, 123, 127 (stating that when the agents started to get up to leave, Gonzalez said he wanted to talk to them).

[37]   *See id.* at 158 ("A.  After we got up to leave, again, I said, I'll see you in New York.  You're coming back to New York.  You are not going back to the DR. . . . and Mr. Gonzalez was saying something to Investigator Ralat and then Investigator Ralat said come back in, sit down, he wants to talk to us.").

[38]   *See id.* at 220 ("A.  He said something to Billy in Spanish and Billy turned to us and said, he doesn't want us to go.  He wants himself, Billy Ralat, to ask him more questions.  He didn't want to say anything yet.  He didn't want to – he didn't want us to leave, but he wanted Billy to turn to talk."); *id.* at 267-268 (stating that the agents packed up to go when Gonzalez stopped Ralat from leaving).

[39]   *See, e.g., id.* at 104-105, 123 (Detective Gonzalez stating that there was no discussion between Ralat and Gonzalez before Gonzalez signed the second *Miranda* waiver form ); *id.* at 162, 210 (Detective Geiss stating that he did not observe any questioning of Gonzalez between the time the first *Miranda* form was

In sum, I find the testimony of these four witnesses, testifying under oath, to be credible. The arguments made by Gonzalez in support of suppression are based on an incorrect factual predicate, namely, that Gonzalez never waived his right to counsel and that he invoked his right to remain silent and his right to counsel. The agents' testimony contradicts defendant's version of the facts in three important ways. *First,* their testimony establishes that Gonzalez never asked for an attorney at any point during the interrogation. *Second,* their testimony establishes that it was Gonzalez who re-initiated discussions when the agents got up to leave the interview room upon learning that Gonzalez declined to answer any questions. Finally, their testimony establishes that Gonzalez was properly re-Mirandized, without coercion, whereupon he knowingly and voluntarily waived his right to remain silent and his right to counsel. Thus, Gonzalez not only failed to invoke his right to counsel, he validly waived that right as well as his right to remain silent.

Defendant's reliance on *United States v. Guzman*,[40] is misplaced and unavailing. In *Guzman*, Judge Lewis Kaplan of this Court held that "[o]nce a suspect has invoked the right to silence, however, the police must stop questioning

_____

signed and the time the second *Miranda* form was signed).

[40]     724 F. Supp. 2d 434 (S.D.N.Y. 2010).

and 'scrupulously honor' that decision."[41]   Finding that law enforcement agents,

including Investigator Jason Robles and DEA Special Agent Joseph Mercurio, did

not "scrupulously honor" defendant Victor Guzman's right to remain silent, Judge

Kaplan suppressed a post-*Miranda* statement written at the bottom of a *Miranda*

waiver form.[42]   In so doing, Judge Kaplan considered the following set of

circumstances:

> Immediately prior to being advised of his rights, Guzman
> had answered Robles's questions in the computer room.
> Robles then showed Guzman the *Miranda* form and
> explained it to him.  Guzman initialed each paragraph on
> the form, and indicated that he was not willing to speak
> with the officers.  At that point, Robles was obliged to stop
> questioning Guzman.  He did not.  Robles and Mercurio
> remained in the computer room with Guzman, and Guzman
> and Robles continued to talk in Spanish.  At some point,
> Robles showed Guzman the drugs and told Guzman that he
> and Peña [Guzman's girlfriend] would be arrested for the
> drugs they had found in the apartment. The agents also
> handcuffed Peña and took her toward the apartment's front
> door.  In response, Guzman directed Robles to write the
> statement at the bottom of the Miranda form in which he
> claimed responsibility for the drugs.[43]

In *Guzman*, unlike here, it was the officers who continued the questioning after the

defendant had invoked his right to remain silent, rather than the defendant.

---

[41]   *Id.* at 446.

[42]   *See id.* at 447.

[43]   *Id.* at 446-47.

The instant case is more akin to *United States v. Plugh*,[44] where the

Second Circuit revisited its prior decision affirming the district court's order of

suppression (*Plugh I*) in light of *Berghuis v. Thompkins*.[45]   In *Plugh II*, the Second

Circuit found that the defendant did not unambiguously invoke his rights to remain

silent and to counsel. [46]   Notwithstanding that the defendant had failed to clearly

invoke his rights, the *Plugh II* court proceeded to analyze the validity of the

defendant's waiver.  "'Even absent the accused's invocation of [his rights], the

accused's statement during a custodial interrogation is inadmissible at trial unless

the prosecution can establish that the accused in fact knowingly and voluntarily

waived [*Miranda*] rights when making the statement.'"[47]

In finding a valid waiver of *Miranda* rights, and thereby deeming the

inculpatory statements to be admissible, the Second Circuit stated as follows:

---

[44]      648 F.3d 118 (2d Cir. 2011) ("*Plugh II*").

[45]      130 S. Ct. 2250 (2010).

[46]      *See* 648 F.3d at 126 (stating that "at no point did Plugh
unambiguously inform the custodial officers that he wished to invoke his right to
remain silent or his right to speak with an attorney, nor was his course of conduct
such that the officers should reasonably have been put on notice that, consistent
with *Michigan v. Mosley*, 423 U.S. 96, 104 (1975), and *Edwards*, no further
questioning could occur").

[47]      *Id.* at 127 (quoting *Berghuis*, 130 S. Ct. at 2260 (internal quotation
marks omitted, second alteration in original)).

14

Moreover, and consistent with *Berghuis*, we are satisfied that "with a full understanding of his . . . rights" Plugh acted "in a manner inconsistent with their exercise" when he chose to begin speaking with custodial agents at the FBI field office, and, as such made a "deliberate choice to relinquish the protections those rights afford." We reiterate, in this respect, that there is no dispute that Plugh was advised of his *Miranda* rights before he began speaking with the custodial agents or that he understood those rights. Indeed, the record makes clear, first, that Plugh informed the officers that he was familiar with his rights because of his experience as a state corrections officer; second, that the agents advised Plugh of those rights for a second time immediately before he began speaking; and third, as noted, *that Plugh at that point did sign the waiver-of-rights form*. Given these circumstances, his choice to proceed to make inculpatory statements regarding the alleged offense conduct can be seen as nothing less than conclusive evidence of a knowing and voluntary relinquishment of his rights.[48]

Here, as in *Plugh II*, Gonzalez acted in a manner inconsistent with the exercise of his *Miranda* rights when he asked the agents to stay as they began to leave the interview room. Furthermore, as in *Plugh II*, Gonzalez signed an explicit waiver-of-rights form by answering "si" to all of the questions in the second *Miranda* waiver form. Finally, as in *Plugh II*, Gonzalez was very familiar with his *Miranda* rights, and the consequences of waiving those rights, as a result of his lengthy

---

[48]     *Id.* at 128 (quoting *Berghuis*, 130 S. Ct. at 2262) (emphasis added).

criminal record.[49]  Given the lack of coercion and intimidation, I find that Gonzalez

both expressly and impliedly waived his rights to remain silent and to counsel.

Moreover, I find that Gonzalez did not invoke his right to counsel, which had

attached with regard to the Queens Homicide as a result of the original, one-count

Indictment.  Accordingly, barring a violation of Gonzalez's right to a speedy

presentment, I find his Confessions to be admissible.

> **B.    Post-Indictment, Pre-Arraignment Delay Does Not Bar
> Admissibility**

During the suppression hearing, a question arose as to whether there

was a violation of Gonzalez's right to a speedy presentment.  The parties were

given an opportunity to submit additional briefing on this issue and they did.[50]  In

sum, Gonzalez argues that his Confessions should be suppressed because: (1) he

was entitled to a prompt presentment before a magistrate judge despite the lack of a

"formal arrest;" and (2) the six-hour "safe-harbor" rule found at 18 U.S.C. §

3501(c) ("section 3501(c)") does not apply because Gonzalez had been under

arrest for more than six hours before the questioning began.

---

[49]     *See* Gov't Mem. at 6 (noting "Gonzalez's very extensive prior contact with both the state and federal criminal justice systems").

[50]     *See* Government's Supplemental Memorandum of Law in Response to Defendant's Motion to Suppress ("Gov't Supp. Mem.") and Defendant's Reply to Government's Supplemental Response Memorandum ("Def. Reply").

Before addressing the merits of this claim, I first note that Rule 5(a) does not apply here because the arrest warrant for Gonzalez was issued pursuant to an indictment. Rule 5(a) only applies to warrantless arrests or where an arrest is made pursuant to a warrant issued on a complaint. Rule 5(a) provides that a person arrested for a federal offense shall be taken before a magistrate judge "without unnecessary delay." However, Rule 9(c)(1)(B), which governs the execution of arrest warrants, states: "The officer executing the warrant must proceed in accordance with Rule 5(a)(1)." Thus, the standards governing unnecessary delay are identical under Rules 9(c)(1) and 5(a).

Gonzalez argues that he was "arrested" on July 24, 2008, the day before his questioning began, because that is the day the Indictment was handed down and the arrest warrant was issued.[51] Gonzalez disputes the Government's claim that he was not denied his right to speedy presentment when he was interrogated on July 25, 2008, because he had not yet been formally "arrested" on the charge for which he was under indictment. According to Gonzalez, "[t]he Government cannot circumvent a defendant's right to a speedy presentment by

_____

[51]     *See* Def. Reply at 5 ("The previous day, Thursday, July 24, when Mr. Gonzalez was incarcerated in McRae Correctional Facility, a federally-operated prison, he was indicted in federal court, and a federal arrest warrant was issued in connection with that indictment. Clearly, it was at that point that he was 'arrested' within the meaning of § 3501(c).").

simply delaying a formal arrest and conducting pre-counseled interrogations."[52]

Section 3501(c) codified a limited form of the so-called *McNabb-Mallory* rule that required suppression of confessions made where the defendant's detention violated the prompt presentment requirement of Rule 5(a) but after the expiration of the six-hour, safe harbor period.[53] In relevant part, section 3501(c) states as follows:

> In any criminal prosecution by the United States . . . , a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate judge . . . if such confession is found by the trial judge to [1] have been made voluntarily and [2] if the weight to be given the confession is left to the jury and [3] if such confession was made or given by such person within six hours immediately following his arrest or other detention[.]

The crucial question thus becomes at what point was Gonzalez arrested for purposes of section 3501(c).

---

[52]     *Id.* at 4.

[53]     *See Mallory v. United States*, 354 U.S. 449 (1957) (holding that an unnecessary delay in arraigning a defendant in violation of Rule 5(a) renders the defendants' inculpatory statements inadmissible, even if the statements are knowing and voluntary).

As explained by the Supreme Court in *United States v. Alvarez-Sanchez*,[54] there must be a triggering event that invokes the terms of section 3501(c).

> Clearly, the terms of the subsection can apply only when there is some "delay" in presentment. The term [delay] presumes an obligation to act. Thus, there can be no "delay" in bringing a person before a federal magistrate until, at a minimum, there is some obligation to bring the person before such a judicial officer in the first place. Plainly, a duty to present a person to a federal magistrate does not arise until the person has been arrested for a federal offense. . . . Until a person is arrested or detained for a federal crime, there is no duty, obligation, or reason to bring him before a judicial officer "empowered to commit persons charged with offenses against the laws of the United States," and therefore, no "delay" under § 3501(c) can occur.[55]

The filing of an indictment triggers a defendant's Sixth Amendment right to counsel.[56] The filing of an indictment does not, however, give rise to an

---

[54]  511 U.S. 350 (1994).

[55]  *Id.* at 357-58 (footnote omitted).

[56]  *See Brewer v. Williams*, 430 U.S. 387, 398 (1977) (stating that the Sixth Amendment right to counsel arises "at or after the time that judicial proceedings have been initiated . . . 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment'") (quoting *Kirby v. Illinois*, 406 U.S. 682, 689 (1972)).

obligation to bring a defendant before a magistrate judge.[57]  Gonzalez attempts to

distinguish *United States v. Nguyen*[58] – a case with similar facts – on the ground

that the defendant was in state custody at the time the federal indictment was

issued.  I disagree.  The *Nguyen* court stated:

> Rule 5(a), Fed.R.Crim.P., *McNabb–Mallory*, and § 3501
> are exclusively concerned with delays between a
> defendant's arrest or detention and his arraignment.
> Nothing in Rule 5(a) or *McNabb–Mallory* concerns delays
> between a defendant's indictment and his arraignment.
> And here, Nguyen complains only of the delay between the
> return of the Superseding Indictment on December 4, 2003
> and his arraignment on December 19, 2003.  In *United
> States v. Alvarez–Sanchez*, 511 U.S. 350 (1994), the
> Supreme Court made clear that a delay does not compel
> suppression under either Rule 5(a) or § 3501 unless "there
> is some obligation to bring the person before [ ] a judicial
> officer in the first place."  *Id.* at 358 . . . .  Thus, because
> Nguyen's indictment did not give rise to an obligation to
> bring him in front of a judicial officer, the alleged delay
> between the return of the Superseding Indictment and the

---

[57]     *Cf. United States v. Caparella*, 716 F.2d 976, 981, n.1 (2d Cir. 1983)
(noting that the Speedy Trial Act "originally contained three time limitations –
thirty days from arrest to the filing of an information or indictment, ten days from
indictment to arraignment, and sixty days from arraignment to trial," and that "[i]n
1979 the Act was amended to merge the ten and sixty day periods into one seventy
day period"); *United States v. Perez–Torribio*, 987 F. Supp. 245, 248 (S.D.N.Y.
1997) (rejecting defendant's argument that the Speedy Trial Act should be
construed to contain a thirty-day indictment-to-arraignment period as against the
plain language of the statute).

[58]     313 F. Supp. 2d 579 (E.D. Va. 2004).

arraignment cannot serve as the basis for suppression.[59]

But without a formal arrest, there must be some point where a defendant is deemed arrested for purposes of these evidentiary rules. Without some point triggering the presentment requirement, defendant's concern over "absurd results" would become a reality. "Indeed, if the government's logic were to prevail and if a formal arrest of an already-incarcerated federal inmate was necessary to trigger the presentment requirement then it would have been lawful if the interrogation which began on July 25, 2008 were to continue to this very day, so long as federal officials continued to refrain from formally 'arresting' Mr. Gonzalez."[60] To prevent such unlimited access to a criminal defendant, I find that Gonzalez was constructively arrested at the time the interrogation commenced for purposes of Rule 5(a), *McNabb-Mallory*, and section 3501(c).[61] However, because the interrogation started at approximately 11:00 a.m. and ended at approximately 3:10 p.m., I find that the six-hour, safe haven rule of section 3501(c) permits a

---

[59]     *Id.* at 592-93 (parallel citations omitted).

[60]     Def. Mem. at 4.

[61]     *Cf. United States v. Jones*, 129 F.3d 718, 721 (2d Cir. 1997) (analyzing the language of the Speedy Trial Act and stating that the "triggering arrest must be [an arrest] 'in connection with such charges.' 'An arrest that is not for purposes of answering to criminal charges thus does not begin the thirty-day period.'") (quoting 18 U.S.C. § 3161(b) and *United States v. Bloom*, 865 F.2d 485, 490 (2d Cir. 1989) (emphasis omitted)).

finding of admissibility.  Accordingly, Gonzalez's motion to suppress is denied and his Confessions are admitted.

My ruling should not be interpreted as condoning the practice of pre-arraignment interviews which I understand is practiced only by the U.S. Attorney's Office for the Southern District of New York.  As stated by the Second Circuit in *United States v. Perez*,[62] courts should

> remain troubled by the practice, not only because of its inherent compulsion implicating a defendant's Fifth Amendment *Miranda* rights but, perhaps more importantly, because of its potentially adverse impact on the Sixth Amendment rights of indigent suspects. . . . The delay occasioned by the interview process, which was conceded by the AUSA here to have been designed to afford defendant an opportunity to confess, puts the indigent defendant at a comparative disadvantage.  Unlike a wealthier suspect who may immediately retain counsel following arrest, the indigent suspect is without benefit of counsel until his arraignment.[63]

The Second Circuit further cautioned:

> We are mindful of the cogent reasons given for the existing interview procedure and the positive benefits claimed to law enforcement.  Yet, the procedure generally envisions a "minimal delay" in time of presentment and specifically provides that where an interview may mean the difference between same day or following morning presentment, the interview "should be foregone."  The road to presentment

---

[62]     733 F.2d 1026 (2d Cir. 1984).

[63]     *Id.* at 1036.

before a magistrate for one accused of a crime should not
be paved only with good intentions.[64]

Although such procedure, "if carefully applied" is not "unlawful or

unconstitutional,"[65] it is nonetheless troubling.

## III.    CONCLUSION

For the foregoing reasons, defendant's motion to suppress his three

written statements is denied.  The Clerk of Court is directed to close this motion

(Docket Entry # 34).  A final pre-trial conference has been scheduled for December

5, 2011, at 4:30 p.m. in Courtroom 15C.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            November 29, 2011

---

[64]    *Id.*

[65]    *Id.*

**- Appearances -**

**For the Defendant:**

Jeremy Schneider, Esq.
Lucas Anderson, Esq.
Rothman, Schneider, Soloway &
  Stern LLP
100 Lafayette Street, Suite 501
New York, NY 10013
(212) 571-5500

David S. Greenfield, Esq.
100 Lafayette Street, Suite 501
New York, NY 10013
(212) 481-9350

**For the Government:**

Laurie A. Korenbaum
Michael D. Maimin
Assistant United States Attorneys
One Saint Andrew's Plaza
New York, NY 10007
(212) 637-2266/2238